FILED
 S DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION        2006 JUL 12  A 10: 35

DISTRICT OF UTAH

BY: _____
     DEPUTY CLERK

| ROSSA LEE SIMMONS, | **FINDINGS OF FACT** |
| --- | --- |
| Plaintiff, | **AND** |
|  | **CONCLUSIONS OF LAW** |
| vs. | Case Nos. 2:02-cv-0214, |
|  | 2:02-cv-0574 |
| UINTAH COUNTY, UINTAH HEALTH CARE SPECIAL SERVICES DISTRICT, et al., | Judge Dee Benson |
| Defendants. |  |

## I. Introduction

Plaintiff Rossa Lee Simmons brings this lawsuit alleging that Defendant Uintah Health Care Special Services District ("the District") violated her due process rights under 42 U.S.C. § 1983 when the District terminated her employment as Administrator of its health care facility in Vernal, Utah. A bench trial was held on this matter from May 1 through May 3, 2006. Steve K. Gordon and Chad J. Pomeroy represented the District. Kenneth B. Grimes represented Ms. Simmons. Having considered the pleadings submitted by the parties, the testimony of the witnesses, and the arguments of counsel, the Court makes the following rulings.

## II. Background

Uintah County owned and operated Uintah County Care Center ("Care Center"), a health care facility in Vernal, Utah. In 1985, the County hired Ms. Simmons to work as an office manager at the Care Center. Approximately one year later, in 1986, Ms. Simmons was promoted to Administrator. As Administrator, Ms. Simmons helped oversee the operation of the Care Center and reported its activities to Uintah County Commissioner Cloyd Harrison.

In June 2000, Commissioner Harrison formed an advisory board to consider transferring

authority over the Care Center from the County to a special service district, with the aim of cutting operation costs which were paid by county taxes. Consequently, on December 11, 2000, the County created the Uintah Health Care Special Services District. By January 1, 2001, the District assumed control and management over the Care Center. At that point, Ms. Simmons, along with all other employees of the Care Center, became employees of the District. The District acted as a political subdivision of the state and remained closely associated with the County.[1] The District formed the Administrative Control Board ("the Board") to make decisions regarding the management and operations of the Care Center. On behalf of the District, the Board adopted the existing policies and procedures of the County, including the County's Reduction in Force Policy ("RIF"). The RIF Policy outlines the procedure the County is required to follow before eliminating an employee's position due to a reduction in force.

The Board also decided that it could further reduce operation costs by "privatizing" the Care Center and turning its management over to a private entity. The Board selected Traditions Health Care, Inc. ("Traditions") to do so and on February 13, 2001, the District entered into a contract with Traditions to take over operations of the Care Center. The parties discussed personnel decisions, including the subject of Ms. Simmons' continued employment at the Care Center. Dissatisfaction with Ms. Simmons' job performance was expressed.[2] Traditions suggested that the Care Center could reduce its costs by terminating Ms. Simmons' employment altogether and having a Traditions employee perform her administrative duties. Some board

---

[1] The County remained involved with the Care Center after the District formally assumed control. For example, Commissioner Harrison continued to attend all District board meetings, the District's Board was comprised of the same individuals that were on the County advisory board, and its employees and administrators were essentially the same as they were under the County Commission's control.

[2] At least one Board member testified that the Board was "very unhappy" with Simmons as Administrator. Additionally, Commissioner Harrison testified that Simmons job performance was a factor in the Board's decision to accept Traditions' recommendation to terminate her.

2

members discussed the possibility of terminating Ms. Simmons for cause,[3] however, the Board resolved to terminate Ms. Simmons through a RIF based upon Traditions' recommendation.

On February 14, 2001, Ms. Simmons was terminated pursuant to a reduction in force. The County Personnel Director notified Ms. Simmons of her termination and she was sent a letter stating that she had been RIFed pursuant to "Section 250.1 and 250/2 of the Uintah County Policies and Procedures." The termination letter also informed Ms. Simmons that she would be placed on the "reappointment roster" for one year and would be eligible for rehire within that period for any position for which she qualified.

After Ms. Simmons' termination, a Traditions employee was hired to fulfill the duties of Administrator.

On March 14, 2002, Simmons brought suit against both the County and the District alleging (1) the defendants deprived her of a property interest in her public employment by terminating her in violation of 42 U.S.C. Section 1983, and (2) gender discrimination under Title VII.

Both sides moved for summary judgment. On February 8, 2005 the Court issued an Opinion denying Defendants' motions while granting, in part, Plaintiff's motion. Specifically, the Court ruled "[t]here is no genuine factual dispute that the Defendants failed to fully adhere to its [RIF] Policy's requirements. The Court therefore grants summary judgment on behalf of the Plaintiff for the narrow finding that the District failed to follow the procedures of its RIF Policy when terminating Simmons' employment." Simmons v. Uintah County, et al., No. 93 (D. Utah February 8, 2005) (order granting partial summary judgmnet).

---

[3]Board members originally suggested that costs for unemployment benefits could be avoided by terminating Simmons for cause. However, Traditions proposed, and the Board ultimately agreed, to terminate Simmons through a RIF because it would allow Simmons to collect unemployment benefits and therefore would be the more "humane" approach to firing her.

3

Subsequently, Ms. Simmons voluntarily dismissed the County as a Defendant and dropped her Title VII discrimination claim altogether. The only claim remaining at trial, therefore, was Ms. Simmons' Section 1983 due process claim against the District.

The Court conducted a final pretrial conference the week before the trial began. At this time, the District moved for dismissal of Plaintiff's claim arguing (1) that the district is immune from liability for the actions of its employees, and (2) that the District was not legally required to provide Ms. Simmons with due process because she was an at-will employee and therefore did not have a protectable property interest in her emJuly 11, 2006ployment. The Court reserved ruling upon the District's motion to dismiss until the conclusion of the trial. A three-day bench trial was then held.

### III. Findings of Fact and Conclusions of Law

Having reviewed the evidence and the testimony at trial the Court adopts the following Findings of Fact and Conclusions of Law.

*A.* *Findings of Fact*

1. Before the District was created, Uintah County owned and operated the Uintah Care Center, a health care facility located in Vernal, Utah.

2. Before the District was created, Care Center employees were County employees.

3. Ms. Simmons began working for the County in 1985 as the Care Center's office manager. In 1986, she was promoted to Care Center Administrator.

4. Before the District was created, Ms. Simmons reported to the Uintah County Commission and was supervised primarily by County Commissioner Cloyd Harrison who oversaw the Care Center.

5. In June, 2000, Harrison established an advisory board consisting of community volunteers who gave input regarding operating the Care Center.

6. The Advisory Board investigated ways to reduce costs to make the Care Center self-

sufficient instead of dependent on money from property tax, as it had been for years.

7. In this regard, the Advisory Board investigated creating a special services district to operate the Care Center.

8. On December 11, 2000, the Commission created the District to operate the Care Center.

9. The District began operating the Care Center on December 18, 2000. After this date, the Care Center employees, including Ms. Simmons, were District employees.

10. The following were appointed to the District's Administrative Control Board: (a) Dr. Karl Breitenbach; (b) Joesph Shaffer; (c) Keith McDonald; (d) Gary Showalter; (e) Duane Hall; (f) Len Gotfredson; (g) Edwin Bulloch.

11. At a January 9, 2001, Board meeting, John Bramall, President of Traditions Health Care discussed cost cutting options. The members of the Board then decide to solicit bids from private companies to run the Care Center.

12. At a January 31, 2001, Board meeting, representatives of three companies made presentations.

13. At a February 5, 2001, Board meeting, the members of the Board adopted the County's Policies and Procedures Manual as the District's official policies.

14. At the February 5, 2001, Board meeting, the members of the Board voted to have Traditions run and manage the Care Center.

15. During a February 13, 2001, Board meeting, the Board went into executive session, during which Bramall recommended that the District terminate Ms. Simmons' position at the Care Center pursuant to a reduction in force.

16. The members of the Board followed Bramall's recommendation and voted to terminate Ms. Simmons' position at the Care Center pursuant to a RIF.

17. On February 14, 2001, Barbara Patterson, the County's Personal Director, prepared a letter notifying Ms. Simmons that her employment at the Care Center was being

terminated pursuant to a RIF.

18. On that same day, Bramall and Patterson met with Ms. Simmons, notified her that her employment at the Care Center was being terminated pursuant to a RIF, and gave her the February 14, 2001 letter.

19. Shawn Matheson then became the Care Center Administrator. For approximately the first year, Matheson was a Traditions employee. Thereafter, the Care Center Administrator once again began a District employee.

20. The Policies include a RIF policy which requires the creation of a work force adjustment plan, and a two week notice before and RIF.

21. The members of the Board did not follow the RIF Policy when they terminated Ms. Simmons' position.

22. In failing to follow the RIF Policy, the members of the Board did not implement or execute a policy, custom or decision officially adopted and promulgated by the District. Rather, they violated and acted contrary to a policy, custom or decision officially adopted and promulgated by the District.

23. The members of the Board would have voted to terminate Ms. Simmons' position even if they had followed the RIF Policy.

24. The decision by the members of the Board to terminate Ms. Simmons' position was part of a legitimate reduction in force, and not a sham to circumvent the District's Discipline Policy.

25. The cost to th District of keeping the Care Center Administrator position on its payroll, and keeping Ms. Simmons in that position, would have been $62,433.00 per year. See Exhibit P-30. During the time Matheson was a Traditions employee, the District paid Traditions $40,000.08 to cover Matheson's salary. See Exhibit P-31. Thus, the District saved $22,432.92 by terminated Ms. Simmons' position pursuant to a RIF.

26. The decision by the members of the Board to terminate Ms. Simmons' position was not arbitrary, did have a rational basis, and did not "shock the conscience."

27. The Policies include grievance and appeal policy, which specifies how Ms. Simmons could seek administrative review of the decision by the members of the Board to terminate Ms. Simmons' position pursuant to a RIF. Ms. Simmons did not follow the Grievance Policy to seek administrative review of the Board's decision.

### B.   *Conclusions of Law*

1. The District is Not Liable for the Board's Decision to Terminate Ms. Simmons.

a. In 1978, the United States Supreme Court held that municipalities and other bodies of local government cannot be liable under Section 1983 based on the doctrine of *respndeat superior*. See Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658 (1978). In 1986, the Court reiterated Monell, holding that a municipality may be held liable under Section 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Permbaur v. Cincinnati, 475 U.S. 469, 480 (1986). Two years later, the Court explained the basis for its holding in Monell by stating:

> Monell's rejection of *respondeat superior*, and its insistence that local governments could be held liable only for the results of unconstitutional government "policies," arose from the language and history of § 1983. For our purposes here, the crucial terms of the statute are those that provide for liability when a government "subjects [a person], or causes [that person] to be subjected," to a deprivation of constitutional rights.

City fo St. Louis v. Praprotnik, 485 U.S. 112, 122 (1988). The Court then explained: "[a]ware that governmental bodies can act only through natural persons, the Court concluded that these governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights." Id. (emphasis added). The Court added that:

> Reading the statute's language in light of its legislative history, the Court found that vicarious liability would be incompatible with the causation

> requirement set out on the face of § 1983. That conclusion, like decisions that have widened the scope of § 1983 by recognizing constitutional rights that were unheard of in 1871, <u>has been repeatedly affirmed</u>.

<u>Id</u>. (emphasis added).

The Court then distinguished the acts of the municipality from the acts of its officials by stating "[w]hen an official's discretionary decisions are constrained by policies not of official's making, those policies, rather than the subordinate's departures from the m are the act of the municipality." <u>Id</u>. at 126-7. In sum, <u>Monell</u> and its progeny have established that a government entity is not liable under Section 1983 if its employees or official violate the plaintiff's constitutional rights while acting contrary to an official policy adopted by the entity.

  b. That point was confirmed by the United States Court of Appeals for th Fifth Circuit in <u>Spann v. Tyler Ind. School Dist.</u>, 876 F.2d 435 (5th Cir. 1989). <u>Spann</u> involved a six-year-old special education student named Jason who regularly rode a bus to school. The bus driver sexually abused Jason. After the first incident, Jason's mother reported tot he school principal that she suspected her son was being abused. The principal failed to investigate, and a subsequent abuse occurred.

Jason's mother filed a Section 1983 claim against the Tyler Independent School District. A jury returned a verdict in favor of the plaintiff. On appeal, the Fifth Circuit reversed, stating:

> The repetition of Jason's injury was not caused by school board policy; the school board had a perfectly reasonable policy for dealing with the reported instances of sexual abuse. Instead the injury was caused by the failure of an employee to properly exercise the discretion granted him by the policy of [the school board].

<u>Id.</u> at 438. The Court then stated that "[t]o hold [the school board] liable fro the omission of the principal would fly in the face of <u>Monell</u>'s explicit holding that the school board cannot be held liable for the acts of its employees on the basis of *respondeat superior*. <u>Id.</u> at 439.

  c. The same conclusion applies here. In the Pretrial Order, the parties stipulated that: (1)

8

the District officially adopted the RIF Policy, which specifies certain prerequisites that must be satisfied before any RIF; and (2) the Board failed to follow the RIF policy. The evidence presented at trial was consistent with this stipulation. Thus, as in Spann, Simmons' alleged harm was not caused by District policy; "the [District] had a perfectly reasonable policy for dealing with [reductions in force]." Id. at 438. Instead the alleged injury was caused by the failure of the members of the Board to follow the District's policy. Thus, holding the District liable for the omissions of the Board members "would fly in the face of" Monell. Under these facts, the District cannot be liable under Section 1983 as a matter of law.

2. The District Did Not Deprive Simmons of Due Process

a. Simmons could have obtained the appropriate level of due process by following the Grievance Policy to seek administrative review of the Board's decision. She failed to do so. Thus, to the extent there was any lack of due process, it was not due to acts or omissions on the part of the District.

3. The Board's Decision Does Not "Shock the Conscience"

a. To prevail on her substantive due process claim, Simmons must prove that the decision by the members of the Board to terminate her position "shocked the conscience"; that it was arbitrary and without rational basis. See Beus, 2005 U.S. App. LEXIS 16229.

b. The evidence presented at trial established that the District's decision came after a lengthy review of several options to cut the costs of running the Care Center, that it was motivated by cost savings considerations, and that it saved at least $22,432.92. this evidence proved that the decision by the Board was not arbitrary, and that it had a rational basis. Under these circumstances, as a matter of law, this decision does not "shock the conscience." Id.

4. Simmons is Not Entitled to Damages or Reinstatement

a. For Simmons to recover damages on her Section 1983 claim, there must be a causal connection between her alleged injury and the alleged wrongful conduct. See Graham v.

9

Baughman, 772 F.2d 441 (8th Cir. 1985).

b.  If Ms. Simmons' termination would have occurred even in the absence of the District's unlawful conduct, there is no causal connection between the conduct and the injury, and Ms. Simmons is not entitled to compensatory damages. See Garza v. Henderson, 779 F.2d 390 (7th Cir. 1985); Burka v. New York City Transit Auth., 747 Supp. 214 (S.D.N.Y. 1990).

c.  The evidence presented at trial established that Ms. Simmons' employment would have been terminated even if the members of the Board followed the RIF policy. Thus, as a matter of law, Ms. Simmons is not entitled to recover damages. See Laje v. R.E. Thomason Gen. Hosp., 665 F.2d 724 (5th Cir. 1982); Pollack v. Baxtor Manor Nursing Home, 716 F.2d 545 (8th Cir. 1983); Hopkins v. City of Wilmington, 615 F. Supp. 1455 (D. Del. 1985).

d.  Similarly, Ms. Simmons is not entitled to reinstatement. See Perry v. Brakke, 826 F.2d 740 (8th Cir. 1987).

6.  Simmons is Not Entitled to Attorneys' Fees

a.  The Civil Rights Attorney's Fees Act allows a prevailing party in a Section 1983 claim to seek for her attorneys' fees, to the extent they are reasonable. See Robinson, et al., v. City of Edmond, et al., 160 F.3d 1275 (10th Cir. 1998). As noted above, Simmons did not prevail on her Section 1983 claims. Thus, she is not entitled to attorneys' fees.

IT IS SO ORDERED.

Dated this 11th day of July, 2006.

_____
Dee Benson
United States District Judge